## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WILLIAM HENRY HARRISON,

        *Plaintiff*,

     v.

FEDERAL BUREAU OF PRISONS, *et al.*,

        *Defendants.*

Civil Action No. 16-819 (RDM)

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Renewed Motion to Dismiss, Dkt. 14, and Plaintiff's Motion for Reconsideration, Dkt. 16, of the Court's March 31, 2017 Memorandum Opinion and Order, Dkt. 13. The facts of this case are set out in that prior opinion. For the reasons stated below, the Court will **GRANT** in part and **DENY** in part Plaintiff's Motion for Reconsideration, Dkt. 16, and will **GRANT** in part and **DENY** in part Defendants' Renewed Motion to Dismiss, Dkt. 14. The Court will further **DENY** Plaintiff's Motion for Summary Judgment, Dkt. 11.[1]

## ANALYSIS

### A.  Defendants' Renewed Motion to Dismiss

The Court previously dismissed all of Plaintiff William Henry Harrison's claims except for his common law libel claims against the individual defendants—all federal employees—in their individual capacities. Dkt. 13 at 2. Those claims survived because of the government's failure to file a certification prior to the Court's March 31, 2017 decision attesting that the

---

[1]  Although currently listed at Dkt. 19, for reasons explained below, Plaintiff's motion for summary judgment was previously, and properly, docketed at Dkt. 11.

employees were acting within the scope of their employment. *Id*. The Westfall Act "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007) (citing 28 U.S.C. § 2679(b)(1)). Under the Act, the Attorney General (or his designee) is empowered "to certify that the employee 'was acting within the scope of his office or employment at the time of the incident out of which the claim arose.'" *Id*. at 229–30 (quoting 28 U.S.C. § 2679(d)(1), (2)). "Upon the Attorney General's certification, the employee is dismissed from the action, and the United States is substituted as defendant in place of the employee." *Id*. at 230. At the time of the Court's prior opinion, the Attorney General had yet to file such a certification, and, accordingly, the Court denied the government's motion as to Harrison's common law tort claims against the individual defendants. Dkt. 13 at 16.

On April 10, 2017, the Attorney General (through his designee) filed a Westfall certification attesting that the individual defendants were acting within the scope of their employment with respect to the allegedly tortious conduct. *See* Dkt. 14-1. A Westfall certification constitutes *prima facie* evidence that an individual defendant was acting within the scope of his or her government employment. *Jacobs v. Vrobel*, 724 F.3d 217, 220 (D.C. Cir. 2013). After the Attorney General issues a Westfall certification, the burden shifts to the plaintiff "to raise a material dispute regarding the substance of [the certifying official's] determination by alleging facts that, if true, would establish that the defendants were acting outside the scope of their employment." *Stokes v. Cross*, 327 F.3d 1210, 1215 (D.C. Cir. 2003); *see also Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C. Cir. 1994). The pleading standards set out in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), guide the Court's review. *See Jacobs*, 724 F.3d at 221. Accordingly, to rebut a Westfall

2

certification, Harrison must allege more than legal conclusions; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

The D.C. Circuit has offered two slightly different articulations of the choice of law inquiry for purposes of the Westfall Act. *See Kelley v. FBI*, 67 F. Supp. 3d 240, 277 (D.D.C. 2014) (describing this discrepancy in the case law). Under one approach, the Court must apply the law "of the state in which the alleged tort occurred." *Wuterich v. Murtha*, 562 F.3d 375, 383 (D.C. Cir. 2009); *accord Wilson v. Libby*, 535 F.3d 697, 711 (D.C. Cir. 2008). Under the other, the Court must apply the "law of the jurisdiction where the employment relationship exists." *Jacobs*, 724 F.3d at 221; *accord Majano v. United States*, 469 F.3d 138, 141 (D.C. Cir. 2006). For present purposes, however, this nuance is of no consequence. As far as the Court can discern from the complaint and the existing record, the alleged torts occurred in Virginia, and the individual defendants are employed at a Bureau of Prisons ("BOP") facility in Virginia. *See* Dkt. 1 at 3 (Compl. ¶ 1).

The Virginia Supreme Court defines the boundaries of the scope of employment as follows:

> Generally, an act is within the scope of the employment if (1) it was expressly or impliedly directed by the employer, or is naturally incident to the business, and (2) it was performed, although mistakenly or ill-advisedly, with the intent to further the employer's interest, or from some impulse or emotion that was the natural consequence of an attempt to do the employer's business . . . .

*Gina Chin & Assocs., Inc. v. First Union Bank*, 537 S.E.2d 573, 577 (Va. 2000) (emphasis omitted) (quoting *Kensington Assocs. v. West*, 362 S.E.2d 900, 901 (Va. 1987)). Virginia law does not "automatically" place an intentional tort, such as those alleged here, outside of the scope of employment. *Blair v. Def. Servs., Inc.*, 386 F.3d 623, 627 (4th Cir. 2004). Rather, "[t]he test of liability is . . . whether that act was within the scope of the duties of employment

3

and in the execution of the service for which he was engaged." *Comm. Bus. Sys., Inc. v. BellSouth Servs., Inc.*, 453 S.E.2d 261, 266 (Va. 1995) (quoting *Tri-State Coach Corp. v. Walsh*, 49 S.E.2d 363, 366 (Va. 1948)).

Harrison's contention that the individual defendants acted outside the scope of their employment rests on their allegedly improper motives. Under Virginia law, motive is "not *irrelevant* to the issue [of] whether the act was within the scope of employment." *Gina Chin*, 537 S.E.2d at 578 (emphasis added). But it "is not determinative;" instead, "the issue is 'whether the service itself, in which the tortious act was done, was within the ordinary course of such business." *Id.* (quoting *Davis v. Merrill*, 112 S.E. 628, 631 (Va. 1922)). Virginia courts—and other courts applying Virginia law on this point—moreover, have recognized an expansive range of behaviors that may fall within an employee's scope of employment, even in the face of allegedly malicious or otherwise improper motives. For example, a bank teller's participation in a scheme to cash forged checks, in which the teller "act[ed] out of self-interest" in a way that was "'outrageous and violative of [the] employer's rules,'" was not, as a matter of law, outside of the scope of his employment because "in doing so he was performing a normal function of a bank teller in accepting checks for deposit." *Id.* at 579 (quoting *Comm. Bus. Sys.*, 453 S.E.2d at 266). Similarly, the operator of a railroad gate who became sufficiently "agitated when a motorist asked him to raise the gate" that he then "shot at the vehicle and killed one of the occupants" had not "as a matter of law . . . acted outside the scope of his employment" because the proper test was "'whether *the service itself, in which the tortious act was done*, was within the ordinary course of [the employer's] business.'" *Comm. Bus. Sys.*, 453 S.E.2d at 265 (quoting *Davis*, 112 S.E. at 631). In a case involving a Westfall certification, another court held that "a supervisor who, for simply personal reasons" including enmity for the employee, "wanted to get

4

his subordinate fired and used improper means, perhaps even defamation, to reach that end" was clearly acting within the scope of his employment. *Emami v. Bolden*, 175 F. Supp. 3d 616, 621 (E.D. Va. 2016). Not even limited jurisdictional discovery was necessary because the production of "negative, even deceptive" records and evaluations of the type the supervisor was hired to produce fell "squarely within that supervisor's scope of employment under Virginia law." *Id.*

Harrison's libel allegations concern BOP recordkeeping. Specifically, he alleges that the warden, associate warden, unit manager, and case manager who oversaw his incarceration "libelously" marked his file with "an unwarranted Public Safety Factor (PSF)" that prevented his transfer to a lower-security institution. Dkt. 1 at 4–9 (Compl. ¶¶ 9–31); *see also id.* at 11 (Compl. ¶ 39) ("Defendants, and each of them, individually and collectively, have conspired to, and did, libel Harrison's good name and place him in danger while incarcerated due to the maintaining of the knowingly false label of a Sex Offender."). Under the reasoning of the cases discussed above, the false designations that Harrison alleges the individual defendants made regarding his security status were "within the ordinary course of" the business of running a prison, *Gina Chin*, 537 S.E.2d at 578 (quoting *Davis*, 112 S.E. at 631), and the individual defendants were "performing [their] duties . . . in the execution of the services for which [they] w[ere] employed," *id.* (quoting *Comm. Bus. Sys.*, 453 S.E.2d at 266). Even though Harrison has alleged that the individual defendants took actions contrary to BOP policy and acted with improper motives—including "falsely back-dating" his administrative requests, "violating the time constraints imposed upon them" by BOP regulations, and "conspiratorially orchestrat[ing] [an] intentional delay" of his administrative requests for reclassification and transfer, Dkt. 17 at 2—the Court's focus must remain on the character of the actions. And here, all of the allegations

relate to the recordkeeping and prison administration tasks "for which [the individual defendants] w[ere] employed." *Gina Chin*, 537 S.E.2d at 578 (quoting *Comm. Bus. Sys.*, 453 S.E.2d at 266).

The Court, accordingly, concurs with the conclusion made in the Westfall certification that those defendants sued in their individual capacities were acting within the scope of their employment at the time the allegedly tortious conduct occurred. *See Jacobs*, 724 F.3d at 223–24. The Court will, accordingly, dismiss the libel claims made against the individual defendants and substitute the United States as a defendant. *See Osborn*, 549 U.S. at 229–30. The Court, in turn, must then dismiss those claims, because the federal government has not waived its sovereign immunity as to "tort claims 'arising out of . . . libel [or] slander.'" *Wuterich*, 562 F.3d at 387 (quoting 28 U.S.C. § 2680(h)).

## B.    Plaintiff's Motion for Reconsideration

Also before the Court is Harrison's Motion for Reconsideration. Dkt. 16. Because that motion was filed within twenty-eight days of the Court's order dismissing most of Harrison's claims, it is governed by Federal Rule of Civil Procedure 59(e). *See Emory v. Sec'y of Navy*, 819 F.2d 291, 293 (D.C. Cir. 1987). A motion under Rule 59(e) "is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Ciralsky v. CIA*, 355 F.3d 661, 671 (D.C. Cir. 2004) (internal quotation marks and citation omitted). Such motions "cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Kattan by Thomas v. District of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993), *as amended* (June 30, 1993) (quoting *Fed. Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir. 1986)).

6

The bulk of the present motion argues that the Court did not address the substance of Harrison's claims that the individual defendants failed to follow BOP internal procedures and thereby violated the Privacy Act and APA. Dkt. 16 at 1–3. Those arguments were thoroughly addressed in the Court's previous opinion, *see* Dkt. 13 at 8–13, and require no further discussion here. Other arguments raised in Harrison's motion for reconsideration, however, warrant further analysis.[2] The Court addresses each in turn.

1.  *Freedom of Information Act Claim*

Harrison argues that despite the fact that he "never made a request for documents under the [Freedom of Information Act ("FOIA")]," Dkt. 16 at 3, the Court incorrectly concluded that "he has not brought a FOIA claim in this case," Dkt. 13 at 6 n.2, because his status as a *pro se* litigant "entitles him to a reading" of his complaint "that would include claims under . . . FOIA," Dkt. 16 at 4. Harrison is correct that *pro se* complaints are held "to less stringent standards than formal pleadings drafted by lawyers," *Haines v. Kerner*, 404 U.S. 519, 520 (1972), but his request asks too much. The Court cannot conclude that Harrison's complaint can be reasonably construed to allege a FOIA claim. Harrison has denied that he submitted a FOIA request, and he

---

[2]  Harrison's motion for reconsideration alludes to Court's failure to consider a document he filed on August 19, 2016, which was not docketed until August 23, 2017. *See* Dkt. 18 at 1. The document is styled a "Sur-Reply Affidavit in Opposition to Defendants' Motion to Dismiss and for Summary Judgment, and in Support of Motion for Summary Judgment for Plaintiff." *Id.* The majority of that document is duplicated in Harrison's initial opposition to Defendants' first motion and in his motion for reconsideration, and the Court addresses those arguments in the context of the pending motion. Only two additional points were advanced in the August 19, 2016 filing. First, Harrison argues that the government's reply in support of its first motion to dismiss was untimely. *Id.* Given the minor nature of the delay and lack of prejudice to Harrison, however, the Court rejects that argument. *See Cooper v. U.S. Dep't of Justice*, 169 F. Supp. 3d 20, 46 (D.D.C. 2016); *see also* LCvR 7(d) (describing the filing of a reply memorandum as being permitted but not required). Second, he opposes the government's challenge to his *in forma pauperis* status. The Court, however, found no merit to the government's contention. *See* Dkt. 13 at 7 n.3.

has repeatedly characterized his claim as arising under the Privacy Act.  Harrison may, however, seek leave to amend his complaint under Rule 15(a)(2) to allege a FOIA claim relating to Request Number 2016-03486.

      2.    *Constitutional Claims*

Harrison next argues that the Court failed adequately to address his Due Process Clause, Equal Protection Clause, and First Amendment retaliation claims.  Dkt. 16 at 2–3.  The Court first discusses Harrison's arguments for reconsideration of the Court's previous dismissal of his equal protection and due process claims.  The Court then turns to its previous conclusion that Harrison failed to state a claim for First Amendment retaliation, before considering the government's argument that qualified immunity bars any constitutional claim against the individual defendants.

      a.   <u>Due Process and Equal Protection</u>

With respect to Harrison's due process claim, as the Court's previous opinion held, no constitutionally protected liberty interest is implicated by the decision not to transfer a prisoner to a lower-security facility, nor is there a constitutional remedy for the mere failure to maintain accurately or disclose promptly prison records.  *See* Dkt. 13 at 14–15 (citing *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Wilson v. Libby*, 535 F.3d 697, 707 (D.C. Cir. 2008); *Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003); *Franklin v. Barry*, 909 F. Supp. 21, 29 (D.D.C. 1995)).  Harrison has thus failed to state a claim for a due process violation.

With respect to his equal protection claim, Harrison has failed to allege any facts that would distinguish that claim from his due process or First Amendment retaliation claims.  He primarily alleges equal protection violations in concert with the due process claims previously discussed.  *See, e.g.*, Dkt. 1 at 10 (Compl. ¶ 35) (stating that he was "deprive[d] . . . of Due

Process and Equal Protection in the Custody and Classification . . . by [BOP] failing to observe and abide by [BOP's] Program Statement, Rules and Regulation[s] . . . ."); Dkt. 11 at 13 (stating that "defendants deprived him of Due Process and Equal Protection by not adjudicating his properly filed grievances and requests in both a timely and lawful manner"). He does, however, at times employ the language of equal protection, arguing that "other inmates similarly situated were not subjected to the same rules violations and retaliation for seeking proper classification and designation." Dkt. 11 at 16. And it is true that "[e]ven in the absence of a fundamental right or a suspect classification, equal protection requires that a classification between similarly situated individuals bear some rational relationship to a legitimate state purpose." *Brandon v. D.C. Bd. of Parole*, 734 F.2d 56, 60 (D.C. Cir. 1984) (citing *Schweiker v. Wilson*, 450 U.S. 221, 230 (1981)).

As Harrison's complaint makes clear, however, the purportedly illegitimate state purpose that Harrison invokes in support of his equal protection claim is the same retaliatory motive that underlies his First Amendment claim. *See, e.g.*, Dkt. 1 at 10 (Compl. ¶ 35) ("Defendants . . . deprive[d] Harrison of Due Process and Equal Protection . . . solely because Harrison complained about his custody classification and housing assignment, contrary to the manner in which other inmates similarly situated are/were treated."). The D.C. Circuit has not squarely confronted whether a plaintiff who alleges that he is the victim of unlawful government retaliation can maintain a separate equal protection claim premised on nothing more than the allegation that he suffered retaliation, while other, similarly situated individuals did not.[3] Other

---

[3] Within the circuit, the existence of such a claim has at least been suggested. *See Quezada v. Marshall*, 915 F. Supp. 2d 129, 135 (D.D.C. 2013) (describing a "class of one" equal protection violation when the government's alleged purpose in acting was retaliation against the plaintiff for previously asserting contractual rights against the government).

Courts of Appeals have held that when such a claim "is, at its core, a First Amendment retaliation claim," *Martin v. Duffy*, 858 F.3d 239, 252 (4th Cir. 2017), the "equal protection claim is best characterized as a mere rewording of [the] First Amendment retaliation claim" and should be dismissed, *id.* (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 250 (4th Cir. 1999)); *see also, e.g.*, *Teigen v. Renfrow*, 511 F.3d 1072, 1086 (10th Cir. 2007) (holding that a "bare retaliation claim . . . simply cannot form the basis for a constitutional equal protection violation"); *Thomas v. Indep. Tr.*, 463 F.3d 285, 298 n.6 (3d Cir. 2006) ("[A] pure or generic retaliation claim [ ] simply does not implicate the Equal Protection Clause." (quoting *Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997))); *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 440 (6th Cir. 2005); *Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth.*, 100 F.3d 1287, 1295–96 & n.8 (7th Cir. 1996) (holding that claims of retaliation for the exercise of constitutional rights do not "arise under the Equal Protection Clause" because "[t]hat clause does not establish a general right to be free from retaliation," *id.* at 1296 n.8); *Vukadinovich v. Bartels*, 853 F.2d 1387, 1392 (7th Cir. 1988).  *But see Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 155 (2d Cir. 2006) (analyzing an equal protection claim as a distinct cause of action despite it being alleged "[f]or essentially the same reasons underlying the First Amendment retaliation claim" also at issue in the case).

Given the weight and reasoning of this case law, the Court concludes that the well-established First Amendment retaliation framework should be used in cases involving a government action allegedly taken in retaliation for protected First Amendment activities.  The Court, accordingly, once again rejects Harrison's equal protection claim and proceeds to his First Amendment claim.

b.  <u>First Amendment Retaliation</u>

Harrison seeks reconsideration of the Court's prior conclusion that he failed to state a claim under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for retaliation in violation of the First Amendment.  Dkt. 16 at 2–3.  He alleges that the defendants being sued in their individual capacities "retaliated against him for filing administrative grievances, as well as for his multiple litigious filings during his previous BOP incarceration."  Dkt. 11 at 12.  The purportedly retaliatory acts "took the form of a) placing and maintaining an unlawful and false Sex Offender PSF in his BOP file, and b) intentionally delaying [BOP's Administrative Remedy Program (ARP)], through criminal acts, so as to retain the false PSF and deprive Harrison of the privilege of serving his [four]-month sentence in the camp facility (minimum-out custody) as other inmates similarly situated enjoy."  *Id.* at 12–13. Elsewhere, Harrison alleges that BOP unlawfully retaliated against him as early as 2008, when it failed to remove the PSF and to correct his files after he supplied BOP with records indicating that the PSF had been assigned in error.  *Id.* at 14–17.

Defendants originally moved to dismiss, or in the alternative, for summary judgment, Dkt. 9, arguing that because "Plaintiff has failed to show he has any constitutional or statutory right of a placement in or transfer to the camp or to a certain designation[,] . . . the employee-defendants are entitled to qualified immunity," Dkt. 12 at 4.  That argument fails to distinguish between Harrison's First Amendment retaliation claim and his due process argument, but, in any event, the Court declined to reach the qualified immunity question altogether in its previous opinion.  Instead, it dismissed Harrison's retaliation claim for failure to state a claim.  Dkt. 13 at

14–15.  The Court, accordingly, first reconsiders whether Harrison stated a claim before then turning to the individual defendants' qualified immunity defense.[4]

A claim of retaliation in violation of the First Amendment requires a plaintiff to show that "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him."  *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quotation marks omitted).  Here, Harrison alleges that he engaged in constitutionally protected conduct in the form of filing grievances and lawsuits contesting various aspects of his incarceration, both during the term of imprisonment at issue in this case and during a prior custodial sentence.  Dkt. 11 at 12–14.  The non-frivolous use of administrative grievance and legal processes is protected by the First Amendment.  *See Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 584–88 (D.C. Cir. 2002); *Pinson v. Dep't of Justice*, 246 F. Supp. 3d 211, 215, 225–26 (D.D.C. 2017); *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007).  Because the Court must assume the truth of the factual allegations in the Complaint, Harrison's prior use of these processes was constitutionally protected activity for purposes of a First Amendment retaliation claim.

---

[4]  Defendants initially argued that Harrison had failed to exhaust his administrative remedies. Dkt. 9 at 7–10.  Harrison responded that he was unable to complete BOP's ARP because of the length of his sentence, Dkt. 11 at 5, the unavailability of certain forms after his release from prison, *id.* at 8, and because "prison administrators thwart[ed] [him] from taking advantage of a grievance process through machination, misrepresentation, or intimidation," *id.* at 10 (quoting *Ross v. Blake*, 136 S.Ct. 1850, 1860 (2016)).  Defendants did not pursue this line of argument further in their reply, Dkt. 12, and the Court declined to reach the question in its previous opinion, Dkt. 13 at 7.  *Ross* was decided shortly before Defendants filed their motion to dismiss, and they have not addressed the case, nor did they continue to pursue their exhaustion argument after Harrison suggested that the *Ross* decision excused any failure to exhaust.  As a result, Court again declines to address the question.  Defendants may renew the argument in the future, if appropriate.

Harrison has also adequately alleged "retaliatory action sufficient to deter a person of ordinary firmness in [his] position from speaking again." First, he claims that the PSF was left on his file even after a court ordered that it be removed and that this inaction led to his imprisonment under more restrictive conditions than were warranted. Dkt. 11 at 14–15. Second, he alleges that his administrative complaints were processed more slowly than complaints filed by other prisoners, depriving him of even the possibility of a transfer to a less restrictive facility. *Id.* at 16. These consequences are sufficiently severe to deter future protected activity. *See Toolasprashad*, 286 F.3d at 585 (holding that the threat of transfer to more restrictive conditions was sufficiently chilling to state a claim); *Pinson*, 246 F. Supp. 3d at 224 (holding that the refusal to investigate a prisoner's administrative complaints was sufficiently chilling to state a claim). BOP's arguments regarding Harrison's constitutional right (or lack thereof) to obtain a transfer or classification are inapposite, because the allegation here is of retaliation. *Toolasprashad*, 286 F.3d at 585–86 (holding that acts that are insufficient, standing alone, to constitute a constitutional violation may nevertheless give rise to a First Amendment retaliation claim); *see also Pinson*, 246 F. Supp. 3d at 224 (same).

Finally, although a close question, the Court concludes that Harrison has sufficiently alleged a causal link between his engagement in protected activity and the retaliatory consequences he says he suffered. He avers that on January 13, 2016, he told the individual defendants about the erroneous PSF classification and his prior grievances seeking to have that misdesignation removed, at which point they failed to remove the PSF, declined for the first of several times to transfer him to a lower-security facility, and began to slow-walk his administrative grievance. Dkt. 1 at 5–8 (Compl. ¶¶ 17–27); *id.* at 15 (written grievance sent on January 13, 2016, detailing prior attempts to remove PSF); Dkt. 11 at 13; Dkt 17 at 3–16. That

13

temporal relationship is sufficient to allege causation at this early stage of the litigation.  *See Banks*, 515 F. Supp. 2d at 112 (inferring causation when allegedly retaliatory transfer to solitary confinement occurred directly after initiation of grievance procedure).

      The Court next turns to the individual defendants' qualified immunity argument. Harrison may continue to pursue his First Amendment claim only if he can show "(1) that [those defendants] violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Aref*, 833 F.3d at 267 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011)).  With respect to the first element, Harrison has alleged that during his previous periods of incarceration, he was extremely litigious and frequently utilized BOP grievance procedures to raise the PSF and other issues.  During his most recent period of incarceration, those efforts focused on his continuing effort to remove the erroneous PSF designation.  Harrison alleges that in retaliation for his persistence in pursuing litigation and using the grievance process, the individual defendants slow-walked his most recent attempt to utilize the BOP grievance framework to remove that PSF, purportedly manipulating the administrative procedure in such a manner as to deny him any chance at a transfer.  For these reasons and those explained in more detail above, the Court concludes that Plaintiff has adequately alleged a violation of his constitutional right to be free from retaliation for having engaged in activities protected by the First Amendment.

      That right, moreover, was clearly established in early 2016, when the actions giving rise to this litigation occurred.  In the context of a 2002 case involving an "adverse determination" under the Privacy Act, the D.C. Circuit held that the Supreme Court's determination that prisoners "retain their First Amendment 'right to petition the Government for a redress of grievances[ ]' . . .  [e]xtends not just to court filings but also to the various preliminary filings

14

necessary to exhaust administrative remedies prior to seeking judicial review." *Toolasprashad*,

286 F.3d at 584 (quoting *Turner v. Safley*, 482 U.S. 78, 84 (1987)).  That means that prison

"officials may not retaliate against prisoners for filing grievances that are 'truthful . . . and not

otherwise offensive' to [legitimate penological] interests." *Id.* at 585 (quoting *Crawford-El v.*

*Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996) (en banc), *rev'd on other grounds*, 523 U.S. 574

(1998)).  *Toolasprashad*'s analysis was under the Privacy Act,[5] but the Court held that one of the

elements of the statutory claim required the prisoner plaintiff to demonstrate that he was

"exercising his First Amendment rights when he filed the grievances" that precipitated the

alleged retaliation. *Id.* at 584.  And the Court's conclusion on that point is clear: a prisoner

"asserts deprivation of his First Amendment rights" when he claims retaliation for engaging in

litigation or administrative grievance procedures. *Id.* at 586.  While this "prong of qualified

immunity analysis requires [the Court] to determine the right at issue in light of the specific

context of the case, not simply as a statement of general legal principles," *Lash v. Lemke*, 786

---

[5]  The plaintiff in *Toolasprashad* brought suit under 5 U.S.C. § 552a(g)(1)(C) & (g)(4), which
provide that a plaintiff "may obtain civil damages whenever an agency 'intentional[ly] or
willful[ly]' 'fails to maintain any record concerning [the] individual with such accuracy . . . as is
necessary to assure fairness in any determination relating to . . . the individual[,] . . . and
consequently a determination is made which is adverse to the individual.'" *Toolasprashad*, 286
F.3d at 581 (quoting 5 U.S.C. § 552a(g)(1)(C) & (g)(4)).  That case, however, "was decided
. . . four months before BOP's regulation exempting its inmate files from the Privacy Act's
accuracy and damages provision went into effect." *Earle v. Holder*, 815 F. Supp. 2d 176, 183
n.5 (D.D.C. 2011).  The intervening regulation, codified at 28 C.F.R. § 16.97, precludes Harrison
from bringing the Privacy Act claim that the Court previously dismissed, despite the similarity of
his allegations to those in *Toolasprashad*.  *See Ramirez v. Dep't of Justice*, 594 F. Supp. 2d 58,
65 (D.D.C. 2009) ("Having exempted its records from the substantive provision regarding the
agency's recordkeeping obligations, BOP effectively deprives litigants of a remedy for any harm
caused by the agency's substandard recordkeeping."), *aff'd sub nom. Ramirez v. U.S. Dep't of
Justice*, No. 10-5016, 2010 WL 4340408 (D.C. Cir. Oct. 19, 2010); *see also Mahoney v. Bureau
of Prisons*, No. 14-5237, 2015 WL 1606940, at *1 (D.C. Cir. Mar. 24, 2015) (holding that
because *Toolasprashad* "predates [BOP's] exemption of its Inmate Central Records System from
the Act's accuracy provision," it does not stand for the proposition that a Privacy Act claim may
be based "on an allegedly inaccurate record in the system").

15

F.3d 1, 6 (D.C. Cir. 2015) (internal quotation marks and citation omitted), *Toolasprashad* speaks with sufficient clarity to the right to be free from retaliation for the specific type of First Amendment activities that form the gravamen of Harrison's claim.

The Supreme Court's decisions in *Crawford-El v. Britton*, 523 U.S. 574 (1998), and *Ortiz v. Jordan*, 562 U.S. 180 (2011), only buttress that conclusion.  In the former, the Court considered a prisoner's claim that he had been retaliated against in violation of the First Amendment on the basis of his past litigiousness and his contact with the press.  *Crawford-El*, 523 U.S. at 577–79 & n.1.  In rejecting the application of a heightened pleading standard for such actions, the Court never questioned that a prisoner subjected to the alleged retaliation would have been deprived of his rights under the First Amendment.  *Ortiz* involved a prisoner claiming retaliation partly on the basis of her prior filing of grievances.  562 U.S. at 182–83, 186.  While framed primarily as an Eighth Amendment violation brought under 42 U.S.C. § 1983, the Court "recognized the First Amendment interests at stake." *Id.* at 191 n.7.  It held that for purposes of qualified immunity, "the pre-existing law" regarding a prisoner's right to engage in the administrative grievance process free from retaliation "was not in controversy," because the "First Amendment shields prisoners from 'retaliation for protected speech.'" *Id.* at 190–91 (quoting *Crawford-El*, 523 U.S. at 592).

Courts considering the question more recently have similarly held that this right is clearly established for purposes of qualified immunity.  *Pinson*, 246 F. Supp. 3d at 225–26; *Banks*, 515 F. Supp. 2d at 112 ("The law is clear in the D.C. Circuit and elsewhere that the First Amendment protects an inmate's right to file administrative grievances, at least to the extent that such grievances are truthful and not otherwise offensive to legitimate penological interests."  (internal

quotation marks and alterations omitted)).[6]  Harrison has therefore overcome Defendants' assertion of qualified immunity, at least at the motion to dismiss stage.

Defendants also previously moved for summary judgment on Harrison's retaliation claim.  As noted above, Defendants' only argument with respect to that claim is that it is barred by qualified immunity.  Dkt. 9 at 13–15.  On the present record, the Court cannot conclude that the individual defendants are entitled to qualified immunity.  They argue only that they acted reasonably in declining to transfer Harrison on April 15, 2016.  Dkt. 9 at 15.  In support of that contention, they provide (1) a declaration from Christina Kelley, a BOP attorney with access to records from the prison where Harrison was incarcerated, which describes what occurred during the administrative grievance process from March 14, 2016 to May 12, 2016, Dkt. 9-2 at 1–2; (2) BOP records showing the receipt of an administrative appeal from Harrison on March 14, 2016, providing a response deadline of April 23, 2016, *id.* at 6; (3) BOP records showing a further appeal from Harrison on April 26, 2016, providing a response deadline of May 26, 2016, *id.*; (4) BOP records showing that the warden denied Harrison's March 14, 2016 appeal on April 15, 2016, Dkt. 9-3 at 2; (5) BOP records showing that a regional BOP official denied Harrison's April 26, 2016 appeal on May 12, 2016, Dkt. 9-4 at 2; and (6) a BOP program statement

---

[6]  With respect to the form of the prisoner's protected speech, the *Banks* court held that "the law was unsettled as to whether a prisoner's oral complaints must relate to a matter of public concern in order to warrant First Amendment protection," and thus the right alleged to have been violated was not clearly established at the time of the complained-of conduct.  515 F. Supp. 2d at 111–13.  Unlike the plaintiff in *Banks*, Harrison made a written complaint.  *Compare id.* at 113, *with* Dkt. 1 at 15.  To the extent the *character* of the prisoner's prior speech matters to its protected status, the case law is clear that grievances relating to matters of public interest or those made to comply with exhaustion requirements prior to bringing civil rights suits constitute protected speech.  *See Banks*, 515 F. Supp. 2d at 112–113 (collecting cases).  The status of complaints about more mundane aspects of prison life, whether or not set down in formal grievances, is less certain.  In any event, Harrison's grievances and prior litigiousness fall well-within the previously established boundaries of protected speech.

describing the "Inmate Security Designation and Custody Classification" system, which governed the application—but not removal or modification—of the PSF to Harrison's file, Dkt. 9-5.

As the Court has explained above, however, Harrison's allegations of retaliation extend beyond the decision not to transfer him.  He alleges that, among other things, delays in the initial response to his grievance were retaliatory, Dkt. 1 at 6–7 (Compl. ¶¶ 18–24), as were delays in transmitting his appeal to the warden, *id.* at 8 (Compl. ¶ 26), and the decision by the warden's office to invoke an internal regulation allowing additional time to respond to his appeal, *id.* at 8–9 (Compl. ¶¶ 27, 30–31).  The records produced by BOP regarding the processing of Harrison's *appeal* to the warden and regional BOP official are not responsive to these claims.  Whether Harrison's rights were violated, accordingly, remains in dispute.

    3.    *Fraud Claims*

Harrison also argues that the Court failed to address his state law fraud claim and his allegation that Defendants had committed a fraud on the Court.  As to the latter, Harrison has failed plausibly to allege that defense counsel was involved in any of the various actions that he argues constitute fraud or that the government's behavior rises to the level of wrongdoing necessary for such a claim to succeed.  *See Bowie v. Maddox*, 677 F. Supp. 2d 276, 282 (D.D.C. 2010) (describing the high burden of proving fraud on the court); *Blackman v. Harris*, No. 85-0626, 1988 WL 78863, at *1 (D.D.C. July 21, 1988) (same); *see also Parsi v. Daioleslam*, 778 F.3d 116, 131 (D.C. Cir. 2015) (observing that a sanction made under the court's inherent power, such as for fraud on the court, requires clear and convincing evidence of bad faith).  As to the former, any common law fraud claims fail for the same reasons Harrison's libel claims fail.  The alleged fraud occurred in the course of the individual defendants' recordkeeping responsibilities

as prison administrators and therefore falls within the scope of their employment.  The United States must, accordingly, be substituted as a defendant for any prison officials sued in their individual capacity.  But, because the United States has not waived its sovereign immunity under the Federal Tort Claims Act for actions sounding in fraud, those claims—and any against BOP or the individual defendants in their official capacities—must be dismissed.[7]  *See Boling v. U.S. Parole Comm'n*, No. 15-1623, 2017 WL 5956682, at *6 (D.D.C. Nov. 30, 2017) (citing 28 U.S.C. § 2680(h) for the proposition that federal law expressly "exempts fraud and misrepresentation from the general waiver of sovereign immunity" in the Federal Tort Claims Act); *Maxberry v. Dep't of the Army, Bd. of Corr. of Military Records*, 952 F. Supp. 2d 48, 52 (D.D.C. 2013).

    4.    *Motion for Summary Judgment*

Finally, Harrison correctly notes that his opposition to Defendants' first motion to dismiss should have been treated as a motion for summary judgment.  *See* Dkt. 11 at 1 (stating that Harrison "seeks Summary Judgment in his favor").  The Court's memorandum opinion and order addressing Defendants' first motion to dismiss, however, necessarily resolved Harrison's motion with respect to those claims over which the Court lacked jurisdiction, which included aspects of his APA claims and his tort claims against defendants other than those sued in their individual capacities.  Furthermore, the Court's conclusion that Harrison failed to state claims for violations of the Privacy Act, APA, and Due Process Clause also necessarily resolved his motion for summary judgment with respect to those claims.  Finally, the Court has now addressed in greater detail Harrison's equal protection and retaliation claims, holding that the former fails to state a claim independent from the latter and that the latter raises material issues of fact that are

---

[7]  Plaintiff has failed to allege any alternative source of a waiver of sovereign immunity.

in dispute.  The Court, accordingly, concludes that Harrison's motion for summary judgment must be denied.

## CONCLUSION

It is hereby **ORDERED** that Defendants' Renewed Motion to Dismiss, Dkt. 14, is **GRANTED** in part and **DENIED** in part.  It is further **ORDERED** that Plaintiff's Motion for Reconsideration, Dkt. 16, is **GRANTED** in part and **DENIED** in part, and that Plaintiff's Motion for Summary Judgment, Dkt. 11, is **DENIED**.




/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  February 28, 2018